UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
MARIO COSTELLO,

        Petitioner,

-against-                              **MEMORANDUM & ORDER**
                                              16–CV–4189 (PKC)

THOMAS GRIFFIN, Superintendent,
Greenhaven Correctional Facility,

        Respondent.
----------------------------------------------------------X
PAMELA K. CHEN, United States District Judge:

      Petitioner Mario Costello, appearing *pro se*, petitions this Court for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254, challenging his conviction and sentence entered on May 30, 2012 in the Supreme Court of the State of New York, Queens County. For the reasons set forth below, the petition is denied in its entirety.

## BACKGROUND

**I.    Facts[1]**

      Between 9:00 and 9:30 a.m. on December 31, 2008, Harvey Bernstein left his "clean" and "tidy" apartment to go to work. (T. 250-51.)[2] When he returned home around 5:30 p.m., "the place was tossed" and "a couple of hundred dollars' worth of quarters," two leather jackets, silverware, a watch, some wine, and a pillowcase were missing. (*Id.*) One of the living room windows was open and there were blood stains on a living room wall, the window frame, and window ledge. (T. 251-52.) On March 30, 2009, DNA testing of the blood showed that it came

---

[1] Because Petitioner was convicted, the Court construes the facts in the light most favorable to Respondent. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

[2] "T." refers to the transcript of Petitioner's trial from April 18, 2012 to May 4, 2012. (Dkt. 15-3.) The page numbers refer to the document's internal pagination.

from Petitioner, whom Bernstein did not know. (T. 228, 269.) Petitioner was arrested on April 7, 2009. (T. 231.) After his arrest, a court-ordered Buccal swab[3] was taken from Petitioner, which confirmed that his DNA matched the DNA in the blood at the crime scene. (T. 231-32, 312.) Petitioner was indicted on charges of Burglary in the Second Degree and Petit Larceny.

**II.    Competency Hearing**

Before trial, Petitioner asserted that he was not fit to stand trial. Four psychological examinations were performed: three on behalf of the prosecution and one by a defense expert. (H. 2-3.)[4] Petitioner's consultative examiner found that Petitioner did "not possess the basic competencies required to proceed with trial; the cause of this incompetence [was] serious cognitive impairment." (SR 107.)[5] According to the defense expert, Petitioner reported "a long history of using alcohol, cannabis, and crack" as well as a history of "hearing voices telling him that he is 'stupid' and . . . [to] 'kill himself.'" (SR 103, 105; *see also* SR 108-09.) Additionally, Petitioner's intellectual functioning and literacy tests showed an "IQ of 40" and "Kindergarten level" literacy which, as the defense's expert noted, indicated "significant cognitive deficits" and that Petitioner was "functioning within the moderate range of mental retardation." (SR 105-106.) The defense's examiner diagnosed Petitioner with schizophrenic disorder (paranoid type), polysubstance

---

[3] A "Buccal swab" is "a swab taken from the inside of the cheek . . . to compare to the DNA swabs that are collected from [a crime scene]." (T. 207.)

[4] "H." refers to the transcript of Petitioner's competency hearing on January 24, 2012. (Dkt. 15-3.)

[5] "SR" refers to the briefs and accompanying exhibits filed in Petitioner's state court post-trial proceedings. (Dkt. 15-2.)

2

dependence, and "mental retardation, moderate (provisional)." (SR 106.) By contrast, all three of the prosecution's examiners found Petitioner "fit to proceed." (H. 2.)[6]

Justice James P. Griffin of the New York Supreme Court, Queens County held a competency hearing on January 24, 2012. The parties agreed to rely on the expert reports and did not call any witnesses. (*Id*.) Justice Griffin found, after going through "the entire file[]" and reading "all of the doctors' reports," that Petitioner "[was] fit to proceed." (H. 3.)

## III. Trial

Petitioner's jury trial was held from April 18, 2012 to May 4, 2012 before Justice Griffin. First, Detective Matthew Janisch of the New York Police City Department ("NYPD") Queens North Evidence Collection Team testified that he collected blood samples from the wall, window sill, and window ledge of Bernstein's apartment. (T. 197-223.) Second, NYPD Detective Thomas Hirdt testified that he arrived at the crime scene at approximately 9:20 p.m. and "observed items in disarray, a closet that had been gone through, [and] . . . observed blood." (T. 224-25.) He then conducted an initial interview with Bernstein, performed "a canvas[] of the building looking for witnesses, and check[ed] on video cameras." (T. 225.) He was unable to find any witnesses, but Bernstein informed him that the building had video surveillance, and the NYPD's video technical unit "download[ed] a copy of the [surveillance] video" on April 7, 2009. (T. 225, 239.) Hirdt was then shown a hard copy of the video and he confirmed that it was "the same video that [he had] viewed and . . . vouchered." (T. 226.)

Next, Bernstein testified about the events of the burglary described above. (T. 246-87.) He further stated that when the police arrived, he informed them that the building maintained three

---

[6] Copies of the expert reports submitted by the prosecution were not provided to this Court. (*See* Dkt. 10-1 at ECF 41.) Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

3

surveillance cameras and that he knew this because, in addition to being a tenant in the building, he worked for the landlord in "a custodial capacity" to earn "partial credit towards [his] rent." (T. 255.) He and the detectives examined the video surveillance "that evening or . . . the next day" (T. 284-85) and saw "a man with a stocking cap on[,] with [a] pillow case over his arm . . . stuffed with stuff . . . looking around how to get out" of the basement (T. 256-57).[7] Bernstein testified that the police made a copy of the surveillance tape and that the tape shown to him in court was the same one he viewed with the police. (T. 257-58.) The video was entered into evidence and shown to the jury without objection. (T. 258-59.)

On cross-examination, Bernstein admitted that he was not generally responsible for viewing the surveillance tapes in the building, but that "[w]hen it was installed[,] the installer showed [Bernstein] . . . what [he] was looking at and how it operated" so "we would understand how it worked." (T. 277-78.) Defense counsel also elicited from Bernstein that the date-stamp of December 30, 2009 on the video was "off by one day" (T. 278) and that there was nothing on the video indicating "that what is shown there really happened on December 31st rather than December 30th" (T. 280).

At the conclusion of Bernstein's testimony, defense counsel moved for a mistrial, arguing that the security video

> should never have been shown to the jury on the grounds it indicated the date of the incident not relating to the date of [the] alleged crime. That video, if anything, reflects events occurring . . . o[n] December 30, 2008, not December 31st, 2008. . . . No one could explain with any reasonable degree of certainty why the video indicated December 30, 2008. . . . If the Court is not inclined to grant the motion for a mistrial, I'm going to ask basically [the] video be precluded, any testimony concerning the video be stricken, and the jury be told to disregard [the] video in its entirety and not to be considered evidence in chief in this case.

---

[7] No evidence was introduced identifying Petitioner as the man shown in the surveillance video.

4

(T. 289-90.) Justice Griffin denied the motions, finding that Bernstein "g[a]ve an explanation for [the discrepancy] and either the jury accepts that or they don't accept it. So that's an argument for you to make during the closings." (T. 291.) Counsel renewed his motion for mistrial at the conclusion of the prosecution's case and it was again denied. (T. 323-24.)

The prosecution's final witness was Lisa Mertz, an analyst from the New York City Office of Chief Medical Examiner ("OCME"). Before Mertz testified, Justice Griffin requested an offer of proof as to her testimony. The prosecutor explained that Mertz was "the analyst who performed the original DNA analysis and comparison of the crime scene sample" and was "a supervisor" of the other analysts on the case. (T. 242-43.) The prosecutor also stated that the prosecution intended to introduce a redacted version of the DNA report, since Mertz would be "mak[ing] an independent expert determination on the witness stand." (T. 243.) Justice Griffin asked whether the prosecution was "following this course based on [Justice] Sotomayor's concurring opinion in *Bullcoming v. New Mexico* [564 U.S. 647 (2011)]," to which the prosecutor responded in the affirmative and also noted that she was following "the [New York] Court of Appeals law in *People v. Brown* [13 N.Y.3d 332 (2009)]." (T. 243-44.) Justice Griffin then asked defense counsel whether he had any objections, to which he replied that he did not. (T. 244.)

At trial, Mertz was qualified as an expert in the field of forensic biology and DNA testing. (T. 298.) She testified that the OCME tested the blood from the apartment and that it matched a DNA profile from the New York DNA data bank. (T. 300-01, 312.) The profile belonged to Petitioner. (*Id.*) After Petitioner's arrest, the OCME then compared the DNA in the apartment to his Buccal swab and again determined that it was a match to Petitioner. (T. 311-12.) She concluded in her "expert opinion" that the source of the DNA from the crime scene "is an individual by the name of Mario Costello" and that this particular DNA profile would statistically

5

be expected to occur only once in more than one trillion people. (T. 317-18.) However, on voir dire, Mertz testified she did not perform the tests herself, but affirmed that she "supervised the people who performed the various stages of the test," and that she "review[ed] all the paperwork that [was] provided with each step of the DNA processing" and made her "personal individual conclusion" based on "each of the results along with the different steps." (T. 304-05.) The prosecution then entered the case file into evidence over defense counsel's objection. (T. 305, 311.)

Petitioner presented no witnesses. On May 4, 2012, Petitioner was found guilty on both counts. On May 30, 2012, Petitioner was sentenced, as a persistent violent felony offender, to an indeterminate prison term of twenty years to life on the burglary conviction and one year on the petit larceny conviction.

## IV. Direct Appeal

Petitioner appealed his conviction to the New York State Appellate Division, Second Department. In his counseled brief, he argued that the video recording was improperly admitted into evidence because it was not sufficiently authenticated and showed a date other than the date of the burglary. (SR 1-16.) Additionally, in a *pro se* supplemental brief, Petitioner argued that the evidence proving his guilt was legally insufficient and against the weight of the verdict, and that the prosecutor failed to turn over *Rosario* material. (SR 48-56.)

On May 13, 2015, the Appellate Division affirmed Petitioner's judgment of conviction. *People v. Costello*, 128 A.D.3d 848 (N.Y. App. Div. 2015). The court found that the video recording was "sufficiently authenticated with the testimony of a part-time superintendent [(Bernstein)] who maintained the building and was familiar with the operation of the building's video recording surveillance system, as well as the testimony of a detective [(Hirdt)] who obtained

6

a copy of the video recording and vouchered it. Further, under the circumstances presented, the discrepancy between the date of the burglary and the date stamped on the video recording went to the weight of the evidence, not its admissibility." *Id.* at 848. The court also found that Petitioner's contention as to the sufficiency of the evidence was "only partially preserved for appellate review" and that viewing the evidence in the light most favorable to the prosecution, "it was sufficient to establish the defendant's guilt beyond a reasonable doubt[,] . . . [and that] the verdict of guilt was not against the weight of the evidence." *Id.* Finally, the court declined to consider Petitioner's *Rosario* claim on direct appeal because it was based on matter outside the record. *Id.* at 849.

The Court of Appeals denied Petitioner leave to appeal the denial on October 19, 2015. *People v. Costello*, 26 N.Y.3d 1007 (2015).

V.      **Motion to Vacate Judgment**

On or about July 14, 2016, petitioner filed a *pro se* motion to vacate judgment pursuant to CPL § 440.10 ("CPL § 440 motion"). (SR. 88-114.) He argued that the trial court had erred in finding Petitioner fit to stand trial, and that his counsel was ineffective for not presenting the argument that Petitioner was not responsible for his conduct by reason of mental disease or defect. (*Id.*) On August 17, 2016, Justice Griffin denied Petitioner's motion. (SR. 142-44.)

Justice Griffin found that Petitioner's claim that he was not competent to stand trial was procedurally barred, pursuant to CPL § 440.10(2)(c), because sufficient facts appeared in the record to have permitted appellate review of the claim, but Petitioner "unjustifiably failed to raise the issue at that time." (SR 142.) The court also rejected as meritless Petitioner's claim that counsel was ineffective for not asserting an insanity defense; the court explained that Petitioner had "failed to offer probative evidence that such a defense was reasonably likely to succeed." (SR. 142-43.) The court explained that the records attached to petitioner's motion "indicate[d] only one

7

admission to a psychiatric hospital," about 16 years before his arrest, which "lasted only nine months and resulted from a depressive state." (SR. 143.) Justice Griffin further explained:

> While Petitioner had apparently also received outpatient mental health services on six occasions between 1985 and 2007, the mental health diagnoses closest to the time of the crimes at issue were of mood disorder and polysubstance dependence, neither of which would cause him to be unable to appreciate either the nature and consequences of his conduct or that such conduct was wrong. Rather, the diagnoses are predictive of the [Petitioner's] admission in the exhibit that he committed the crimes in order to finance his drug habit.

(*Id.* (citations and internal quotation marks omitted).) The Appellate Division, Second Department, denied Petitioner's motion for leave to appeal the denial of his CPL § 440 motion. *People v. Costello*, 2017 N.Y. App. Div. LEXIS 6291 (2d Dep't Mar. 27, 2017).

## VI. Coram Nobis Motion

On or about October 6, 2016, Petitioner filed a *pro se* coram nobis petition in the Appellate Division, Second Department. He argued that his appellate counsel was ineffective for not arguing that the admission of the OCME DNA case file through a supervising DNA analyst's testimony, instead of the testimony of the technicians who tested the samples, violated Petitioner's Sixth Amendment confrontation rights, and that his trial counsel was ineffective for not raising an insanity defense. (SR. 155-66.)

The Appellate Division denied coram nobis relief on March 29, 2017. *People v. Costello*, 148 A.D.3d 1180 (2d Dep't 2017). The court found that Petitioner had "failed to establish that he was denied the effective assistance of appellate counsel." *Id.* at 1180. The New York Court of Appeals denied Petitioner's leave application on July 7, 2017, *People v. Costello*, 29 N.Y.3d (2017), and denied Petitioner's request for reconsideration on September 28, 2017, *People v. Costello*, 30 N.Y.3d 948 (2017).

## VII. Instant Petition for Writ of *Habeas Corpus*

Petitioner timely filed the instant *habeas* petition on July 25, 2016, and amended it on July 27, 2017. (Dkts. 1, 10.) Respondent filed his opposition on January 18, 2018. (Dkt. 15.)

## STANDARD OF REVIEW

Section 2254 provides that a *habeas corpus* application must be denied unless the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "A state court adjudicates a petitioner's federal constitutional claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Norde v. Keane,* 294 F.3d 401, 410 (2d Cir. 2002) (internal quotation marks and citation omitted).

"Clearly established federal law refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Howard v. Walker,* 406 F.3d 114, 122 (2d Cir. 2005) (internal quotation marks and citation omitted). A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" Supreme Court cases, or it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." *Penry v. Johnson,* 532 U.S. 782, 792 (2001) (citation omitted).

A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* (citation omitted). The Antiterrorism and Effective Death Penalty Act ("AEDPA") establishes a deferential standard of review: "a federal habeas court may

not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe,* 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams v. Taylor,* 529 U.S. 362, 411 (2000)). Courts must "assess whether the state court's decision was 'so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Garner v. Lee*, No. 17-78-PR, 2018 WL 5985932, at *11 n.14 (2d Cir. Nov. 15, 2018) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello,* 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner,* 459 F.3d 200, 203 (2d Cir. 2006)).

## DISCUSSION

Petitioner challenges his conviction and sentence on the following grounds: (1) his appellate counsel was ineffective for not raising a Confrontation Clause argument about the introduction of the DNA evidence; (2) his right to a fair trial was violated because a videotape of the burglary was shown to the jury without being properly authenticated; (3) his right to a fair trial was violated because the prosecutor failed to turn over *Brady* material; (4) his trial counsel was ineffective for not asserting an insanity defense; (5) his appellate counsel was ineffective by not arguing that trial counsel was ineffective for not asserting an insanity defense; and (6) the verdict was against the weight of the evidence and legally insufficient. Assuming *arguendo* that Petitioner's claims are not procedurally barred (*see* Dkt. 15-1), his claims fail on the merits.

10

**I.     DNA Evidence**

First, Petitioner contends that his appellate counsel was ineffective for not raising a Confrontation Clause argument when the court admitted Mertz's testimony and the DNA reports without the testimony of the technicians who actually performed the analyses. (SR 157-64.) Under the standard set forth in *Strickland v. Washington,* 466 U.S. 668 (1984) to establish ineffective assistance of counsel, a habeas petitioner must "(1) demonstrate that his counsel's performance fell below an objective standard of reasonableness in light of prevailing professional norms; and (2) affirmatively prove prejudice arising from counsel's allegedly deficient representation." *Carrion v. Smith,* 549 F.3d 583, 588 (2d Cir. 2008) (quoting *Strickland*, 466 U.S. at 688) (internal quotation marks omitted). To establish ineffective assistance of appellate counsel for failure to raise specific issues, "it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994); *see also Jones v. Barnes,* 463 U.S. 745, 754 (1983) ("For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy.").

Petitioner's ineffective assistance of counsel claim must be rejected. The Confrontation Clause generally prohibits the admission at trial of testimonial statements made by a non-testifying witness against the defendant, unless the witness is unavailable and the defendant "had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). As the Second Circuit recently explained, the Supreme Court's decision in *Bullcoming* "addressed the meaning of 'testimonial' in the context of laboratory testing" and held that "the testimony of another analyst, who was familiar with the device used to test the blood and the lab's procedures

but did not observe the test [at issue] or have an 'independent opinion' concerning the [results], was insufficient to cure the [Confrontation Clause] problem." *Washington v. Griffin*, 876 F.3d 395, 405 (2d Cir. 2017) (citing *Bullcoming*, 564 U.S. at 662-63). The instant case is clearly distinguishable, as Mertz herself testified at trial and explicitly stated during her testimony that she had supervised the technicians who did this testing, personally reviewed and analyzed the results that the technicians had obtained, and came to her own independent conclusions based on the test results. (T. 304-05, 309-10, 317-18.) Furthermore, as the Second Circuit found in *Washington v. Griffin*, even "[a]ssuming *arguendo* that the case file here was admitted for its truth, the Supreme Court has never held that the Confrontation Clause requires an opportunity to cross examine each lab analyst involved in the process of generating a DNA profile" and, on habeas review, a "state court cannot be faulted for declining to apply a specific legal rule 'that has not been squarely established by [the Supreme] Court[.]'" 876 F.3d at 407 (quoting *Harrington*, 562 U.S. at 101).[8]

In a nearly identical case to this one, a *habeas* petitioner challenged the testimony of an OCME forensic scientist/senior supervisor who testified regarding the DNA evidence gathered by police and its match to the petitioner. *Santana v. Capra*, No. 15-CV-1818 (JGK), 2018 WL 369773, at *6 (S.D.N.Y. Jan. 11, 2018). The OCME witness testified that she "did not personally conduct any examination of the evidence," and the record did not clearly indicate whether she rendered any independent opinion as to the validity of the DNA match. *Id.* The court in *Santana* nonetheless found that

> as the Second Circuit Court of Appeals recently concluded, the uncertainty left by *Williams* [*v. Illinois*, 567 U.S. 50 (2012)], *Bullcoming*, and *Melendez–Diaz* [*v. Massachusetts*, 557 U.S. 305 (2009)], reveals that there is no clearly established law from the Supreme Court holding that [the witness's] forensic expert testimony violates the Confrontation Clause. . . . The petitioner rests his argument here on the

---

[8] To the extent that Petitioner is claiming that the trial court erred by admitting the evidence in the first place (*see* Dkt. 10 at ECF 7), this analysis applies with equal force.

12

contention that his appellate counsel was ineffective in not arguing that his trial counsel was ineffective in not raising a Confrontation Clause objection to [the analyst's] testimony. But the decisions of his appellate counsel are entitled to deference and the decision of the Appellate Division denying the ineffective assistance claim is to be overturned only if it is an unreasonable application of clearly established law by the Supreme Court. The petitioner has not met this doubly deferential standard. The petitioner has failed to point to any clearly established law holding that counsel provides ineffective assistance when counsel fails to lodge a Confrontation Clause challenge to forensic testimony in this context, particularly in light of the uncertainty of the underlying law on the Confrontation Clause. The Appellate Division's rejection of his petition for a writ of coram nobis on this ground therefore was not unreasonable.

*Id.* at \*15 (citations and internal quotation marks omitted). The *Santana* court also found that an independent ground on which to deny the petitioner's claim was that "[w]hen [the OCME witness] testified at petitioner's trial[,] . . . there was no colorable Confrontation Clause objection for trial counsel to preserve. Controlling New York law at the time provided that a report of raw DNA testing results that does not offer any conclusion as to whether the DNA 'matches' a given individual did not trigger a criminal defendant's rights under the Confrontation Clause." *Id.* at \*14 (citing *People v. Rawlins*, 10 N.Y.3d 136 (2008)). The Court agrees with the reasoning of *Santana* on both issues and finds that they apply here to support the denial of *habeas* relief.

Accordingly, Petitioner's ineffective assistance of counsel claim relating to the admission of the DNA evidence is rejected.

## II. Video Authentication

Second, Petitioner contends that the surveillance video evidence was admitted in violation of his right to a fair trial. (Dkt. 1, at ECF 5.) Even if the trial court erred in admitting the video under New York state law, "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of *habeas corpus*." *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir. 1983). "The introduction of [improper] evidence against a defendant . . . does not amount to a violation of due process unless the evidence 'is so extremely

13

unfair that its admission violates fundamental conceptions of justice.'" *Vega v. Portuondo,* 120 F. App'x 380, 382 (2d Cir. 2005) (quoting *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir. 1998)). To rise to such a level, the erroneously admitted evidence must have been "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." *McKinnon v. Superintendent, Great Meadow Corr. Facility,* 422 F. App'x 69, 73 (2d Cir. 2011) (quoting *Collins v. Scully,* 755 F.2d 16, 19 (2d Cir. 1985)). In light of the unequivocal and unimpeachable DNA evidence placing Petitioner in Bernstein's apartment, coupled with the minimally probative value of the video in identifying Petitioner as the perpetrator, any error with respect to the video was harmless. *See Wray v. Johnson*, 202 F.3d 515, 525 (2d Cir. 2000) ("[T]he strength of the prosecution's case 'is probably the single most critical factor in determining whether error was harmless[.]'") (quoting *Latine v. Mann*, 25 F.3d 1162, 1167-68 (2d Cir. 1994)).

Accordingly, the Court denies Petitioner's due process claim based on the admission of the surveillance video.

**III.** ***Brady*** **Material**

Third, Petitioner claims that the prosecutor violated her *Brady* obligations by failing to turn over Detective Janisch's memo book notes and his evidence collection team report. (SR 54-55.)[9] To prove that a prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1962), Petitioner must show that the evidence at issue was "favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or

---

[9] Petitioner also asserts a *Rosario* claim (SR 54-55), but violations of *Rosario* are not cognizable on federal *habeas* review. *See Green v. Artuz*, 990 F. Supp. 267, 274-75 (S.D.N.Y. 1998); *Cruz v. Scully*, 716 F. Supp. 766, 769, n.5 (S.D.N.Y. 1989); *United States ex rel. Butler v. Schubin*, 376 F. Supp. 1241, 1247 (S.D.N.Y. 1974), *aff'd*, 508 F.2d 837 (2d Cir. 1975).

inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Petitioner has not established, or even alleged, that this evidence was exculpatory or impeaching; therefore, this claim fails.

Furthermore, there is no evidence in the record indicating that Janisch's notes or report were not, in fact, produced to the defense. Indeed, at trial, defense counsel asked Janisch on cross-examination if he had the evidence collection team report with him, to which Janisch responded that he did. (T. 211-12.) Defense counsel asked to see it, and Janisch handed it to him. (*Id.*) Petitioner's trial counsel did not contend that he had never seen this report before, or that he had not received Janisch's notes. Petitioner's counsel, in fact, had the opportunity to question Janisch about the report. Petitioner has therefore failed to establish that any exculpatory information regarding Janisch's credibility was withheld by the prosecution.

Accordingly, the Court denies Petitioner's *Brady* claim.

## IV. Insanity Defense

Fourth, Petitioner claims that trial counsel was ineffective for not presenting an insanity defense, since it "was the only reasonable defense that [Petitioner] had." (Dkt. 10, at ECF 4; *see also* SR 103-114.) Fifth, Petitioner claims that appellate counsel was ineffective for not arguing trial counsel's ineffectiveness for not asserting an insanity defense.

In denying both claims, the Court relies on the directly applicable reasoning of *Brown v. Walker*:

> [E]ven when reviewed *de novo* the claim is without merit. Petitioner . . . does not contend that he requested counsel to pursue an insanity defense. The mere fact that counsel was aware that [P]etitioner suffered from psychiatric problems is insufficient to establish that []he should have devoted h[is] time to pursuing an affirmative defense rather than seeking to otherwise test the State's case on the elements of the crime—two essentially incompatible defenses. Petitioner has offered the court no reason to believe that counsel's decision to limit investigation into an insanity defense was anything but a reasonable professional judgment made

15

by an attorney who otherwise vigorously represented [his] client. Petitioner's discussion of his suicidal ideations and his visits to the psychiatric ward . . . shed little light on his tacit claim that at the time of the crime he failed to appreciate either the nature and consequences of his conduct or that his conduct was wrong. . . . . There is no substantial probability that the verdict would have been different had [P]etitioner's counsel engaged in further investigation into an insanity affirmative defense.[10]

275 F. Supp. 2d 343, 351 (E.D.N.Y. 2003); *see also Etoria v. Bennett*, 292 F. Supp.2d 456, 473 (E.D.N.Y. 2003) ("Petitioner's psychiatric history alone is insufficient to support an argument that there was a reasonable probability that, had defense counsel mounted a psychiatric affirmative defense, petitioner would not have been convicted[.]"). Because Petitioner cannot demonstrate the underlying claim of ineffective assistance of his trial counsel for not asserting an insanity defense, Petitioner also fails to meet the "substantially higher threshold" to demonstrate ineffective assistance of his appellate counsel for not arguing trial counsel's ineffectiveness. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009); *cf. id.* at 127 ("The law does not require counsel to raise every available nonfrivolous defense.").

Accordingly, the Court denies Petitioner's claim of ineffective assistance of appellate counsel for not arguing that trial counsel was ineffective because he did not assert an insanity defense.

## V. Weight and Sufficiency of the Evidence

Petitioner argues that the verdict should be vacated because the evidence was insufficient for conviction and the verdict was against the weight of the evidence. (Dkt. 1, at ECF 5.) As an initial matter, Petitioner's claim that the verdict was against the weight of the evidence is not cognizable on federal *habeas* review. *See Lopez v. Superintendent of Five Points Corr. Facility*,

---

[10] In fact, after Justice Griffin found Petitioner fit to stand trial, Petitioner stated on the record, "I didn't do that. I was drunk. I don't know what happened. It was a New Year." (H. 6.)

No. 14-CV-4615 (RJS)(JLC), 2015 WL 1300030, at *12 (S.D.N.Y. Mar. 23, 2015) ("It is well-established that a weight of the evidence claim is exclusively a matter of state law and therefore presents no federal question reviewable by a federal habeas court.") (collecting cases), *report and recommendation adopted*, No. 14-CV-4615 (RJS)(JLC), 2015 WL 2408605 (S.D.N.Y. May 20, 2015); *Blake v. Martuscello*, 10-CV-2570 (MKB), 2013 WL 3456958, at *9 (E.D.N.Y. July 8, 2013) ("It is well settled that a 'weight of the evidence' claim . . . is not reviewable in [a] federal habeas proceeding.") (collecting cases); *Kearse v. Artuz*, No. 99-CV-2428 (TPG), 2000 WL 1253205, at *1 (S.D.N.Y. Sept. 5, 2000) (summarily dismissing challenge to verdict against the weight of the evidence on the ground that "[d]isagreement with a jury verdict about the weight of the evidence is not grounds for federal habeas corpus relief").

The Court, therefore, only addresses the merits of Petitioner's claim that the evidence introduced at trial was insufficient to support his conviction. *Blake*, 2013 WL 3456958, at *9 (a "'weight of the evidence' claim is distinct from a 'sufficiency of the evidence' claim"); *Walton v. T.J. Ricks*, 01-CV-5265 (LMM), 2003 WL 1873607, at *6-7 (S.D.N.Y. Jan. 31, 2003) (under New York law, "attacks on a verdict based on the weight of the evidence are different from those based on the legal sufficiency of the evidence[,]" the latter of which is based on "federal due process principles"). The circumstances in which a federal district court may grant *habeas* relief based on insufficiency of the evidence are extremely narrow. As the Supreme Court recently explained: "The opinion of the Court in *Jackson v. Virginia*, 443 U.S. 307 (1979), makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). "[E]vidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond

17

a reasonable doubt.'" *Id*. at 7 (quoting *Jackson*, 443 U.S. at 319). "To have a colorable sufficiency of the evidence claim, [Petitioner] would need to show that the prosecution failed to prove all the elements of the offenses charged." *Alexis v. Griffin*, No. 11-CV-5010 (DLC) (FM), 2014 WL 3545583, at *20 (S.D.N.Y. July 18, 2014), *report and recommendation adopted*, 2014 WL 5324320 (S.D.N.Y. Oct. 20, 2014).

Viewing the evidence in the light most favorable to the prosecution, Petitioner's conviction must stand. To be guilty of burglary in the second degree, a person must "knowingly enter[] or remain[] unlawfully in a building [that is a dwelling] with intent to commit a crime therein." N.Y. Penal Law § 140.25(2). Additionally, "[a] person is guilty of petit larceny when he steals property." N.Y. Penal Law § 155.25. The DNA evidence definitively placed Petitioner in Bernstein's apartment on the day of the break-in, and Petitioner had no lawful purpose for being in Bernstein's apartment as they were not acquainted. Additionally, the surveillance video depicts a man holding Bernstein's recently-stolen pillow case, bulging with property. These facts clearly support Petitioner's conviction for second degree burglary and larceny.

## VI. AEDPA Deference

Because the Court has rejected all of Petitioner's claim *de novo*, it further finds that the state court's rejection of some of the same claims—*i.e.*, the admission of the surveillance video and DNA evidence, the failure to pursue an insanity defense, and ineffective assistance of trial counsel relating to his handling of these issues—was not an "unreasonable application of[] clearly established Federal law," or an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## CONCLUSION

For the reasons set forth above, the petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 is denied. Costello is denied a certificate of appealability, as he has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Middleton v. Att'ys Gen.,* 396 F.3d 207, 209 (2d Cir. 2005) (denying certificate of appealability where petitioner has not shown that "reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further" (internal quotation marks and citation omitted)). Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for purpose of an appeal. *Coppedge v. United States,* 369 U.S. 438, 444-45 (1962). The Clerk of Court is respectfully requested to enter judgment and close this case accordingly.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: November 28, 2018
      Brooklyn, New York